# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | |
|---|---|
| MAUDIE SPENCER for | ) |
| D.M.A., Jr., | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|   v. | )   **Case number 4:05cv0408 TCM** |
| | ) |
| JO ANNE B. BARNHART, | ) |
| Commissioner of Social Security, | ) |
| | ) |
|     Defendant. | ) |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 505 (g) for judicial review of the final decision of Jo Anne B. Barnhart, the Commissioner of Social Security ("Commissioner"), denying D.M.A., Jr. ("Plaintiff") supplemental security income benefits ("SSI") under Title XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 1381-1383d. Plaintiff has filed a brief in support of his complaint; the Commissioner has filed a brief in support of her answer. The case is before the undersigned for a final disposition pursuant to the written consent of the parties. See 28 U.S.C. § 636(c).

## Procedural History

Alleging that Plaintiff was disabled since May 2002 because of behavior problems and asthma, Plaintiff's mother, Maudie Spencer, applied for SSI on her son's behalf. (R.

at 45-51.)[1]  This application was denied.  (Id. at 31, 33-36.)  Ms. Spencer requested a hearing, which was held in April 2004 before Administrative Law Judge ("ALJ") Thomas C. Muldoon.  (Id. at 219-31.)  The ALJ determined that Plaintiff was not under a disability at any time on or before the date of his decision, and denied the application.  (Id. at 13-21.)  The Appeals Council denied review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 4-6.)

## Testimony Before the ALJ

Ms. Spencer, represented by counsel, was the only witness to testify at the administrative hearing.

Plaintiff was born on October 15, 1995, and lived with his mother and three sisters, ages 15, 11, and 7.  (Id. at 222.)  He had had no problems with his growth, weight, or height.  (Id.)  He was currently in the first grade, for the second time.  (Id. at 223.)  He went to speech therapy classes once a week and received special tutoring in language. (Id.)

Ms. Spence had recently taken Plaintiff to the Hopewell Center for a psychological evaluation.  (Id. at 223-24.)  The reason for the evaluation was Plaintiff's behavior problems, specifically, his acting out, his hitting children, his failure to listen, and his need for all the attention all the time.  (Id. at 224-25.)  The psychologist told her Plaintiff had ADHD and he should see the psychiatrist.  (Id. at 226.)

---

[1]References to "R." are to the administrative transcript filed by the Commissioner with her answer.

- 2 -

Plaintiff has been suspended from school for slamming another child on the concrete, for walking on a catwalk, for calling a teacher a "b****", and for telling the principal he would knock everything off her desk. (<u>Id.</u> at 225.) Ms. Spencer does not allow Plaintiff to play with the neighborhood children because she does not want any confrontations with their parents. (<u>Id.</u> at 226.) He plays basketball, rides his bicycle, and plays video games. (<u>Id.</u>) She watches him when he plays outside so he does not get into trouble. (<u>Id.</u>) She also tries to go to his school every two weeks to check on his behavior. (<u>Id.</u> at 227.) He plays on a football team with a boys' club. (<u>Id.</u> at 228.) When he first started, he would fight with the other players, but stopped that behavior when the coach told him it was "his way or the highway." (<u>Id.</u>)

Plaintiff has chores to do at home, but needs constant reminders. (<u>Id.</u> at 227.) He does dress himself well, including tying his own shoes. (<u>Id.</u>) He does not go to bed when told, but gets into things. (<u>Id.</u> at 228.) For instance, one night he started a fire in a trash can when he put a burning piece of newspaper in it. (<u>Id.</u>) The newspaper was burning because Plaintiff had put it in the oven, which was on with the door open for heat, to catch it on fire. (<u>Id.</u>) Another time, he and his youngest sister put a burning piece of paper into a cabinet. (<u>Id.</u> at 229.) He also is constantly jumping off the porch, which is six to eight feet above the ground. (<u>Id.</u>)

## School and Other Records Before the ALJ

The documentary record before the ALJ included records completed on Plaintiff's behalf, school records, and medical records.

A function report completed by Ms. Spencer in September 2002 described Plaintiff's ability to progress in learning limited in that he did not know the days of the week and months of the year and could not (a) read capital letters, small letters, or simple words, (b) read and understand simple sentences or stories in books or magazines, (c) write in script, (d) spell most three to four letter words, (e) write a simple story, (f) add and subtract numbers over ten, (g) understand money, and (h) tell time. (Id. at 73.) Plaintiff had no friends his own age, could not make new friends, and did not generally get along with adults, including his mother. (Id. at 75.) He did, however, generally get along with his school teachers. (Id.) Plaintiff also had difficulty taking a bath or shower without help; combing, brushing, or washing his hair; picking up and putting away his toys; doing what he was told; obeying safety rules; and accepting criticism or correction. (Id. at 76.) He had difficulty finishing things he started and completing homework. (Id. at 77.) He did complete his chores most of the time and could keep busy on his own. (Id.) He had no problems seeing, hearing, or communicating. (Id. at 70, 71.)

In a separate daily activities report, Ms. Spencer reported that Plaintiff lacked any self-control, hit his sisters, and would not follow directions. (Id. at 79, 81.) He was able to take care of his personal needs and was active in sports. (Id. at 81, 82.) He took Albuterol, Zytec, and Flovent for asthma. (Id. at 80.)

Medical records confirm Plaintiff's asthma and its generally uneventful history. (Id. at 166-69, 171-72.) A notation in March 2002, however, reads that compliance with Flovent was poor due to Ms. Spencer's work schedule.[2] (Id. at 172.)

Plaintiff's school records included progress reports, behavior reports, and documents relating to his individual education program ("IEP"). Additionally, a teacher completed a form questionnaire.

Plaintiff's first grade teacher, Ms. Colli,[3] completed a form questionnaire on October 23, 2002. (Id. at 96.) Plaintiff had been in her class since the beginning of the 2002/2003 school year.[4] (Id. at 89.) She reported that he had an obvious problem in two of ten activities involving acquiring and using information, a slight problem in seven activities, and no problem in one activity. (Id. at 90.) He did not have a serious or very serious problem in any of the ten activities. (Id.) She noted that he was showing improvement in math and reading after receiving individualized instruction. (Id.) Rating Plaintiff's ability to attend and complete tasks, Ms. Colli assessed him as having a serious problem in one of the thirteen activities, "[w]orking without distracting self or others." (Id. at 91.) In all but one of the other twelve activities Plaintiff had either a "slight"

<hr>

[2]Ms. Spencer worked as a bus driver. There are some references in the record to her having two jobs.

[3]The signature on the questionnaire is illegible. In his brief, Plaintiff refers to his teacher as Catherine Colli. The Court will assume he is correct.

[4]Ms. Colli reported that she had known Plaintiff since September 2001; however, he had been in her classroom only since the beginning of the 2002/2003 school year. She later refers to the "short time" she had had Plaintiff in her classroom. (Id. at 96.)

problem or an "obvious" problem. (<u>Id.</u>) He had no problem in "[s]ustaining attention during play/sports activities." (<u>Id.</u>) In the area of interacting and relating with others, Plaintiff again had a serious problem in only one activity, "[e]xpressing anger appropriately." (<u>Id.</u> at 92.) He had either a "slight" or "obvious" problem in the other twelve activities. (<u>Id.</u>) In caring for himself, Plaintiff had a "slight" problem in six of the ten activities and no problem in the remaining four, including in "[h]andling frustration appropriately." (<u>Id.</u> at 94.) Ms. Colli further noted that Plaintiff took medication on a regular basis and that his functioning changed after taking it. (<u>Id.</u> at 95.)

Plaintiff's first quarter first grade report card for the 2002-2003 school year, described his skills as "developing" in all academic areas and in music and physical education. (<u>Id.</u> at 124.) His art skills were described as "secure." (<u>Id.</u>) His skills did not satisfy the highest criterion, "met standard," nor were they so lacking that the lowest criterion, "not yet," was applied. (<u>Id.</u>) Plaintiff's teacher noted that there had been some improvement in his attitude toward his schoolwork and the other students, but the improvement was inconsistent. (<u>Id.</u> at 125.)

In a February 2003 progress report, the teacher commented that he was not ready or mature enough for the second grade. (<u>Id.</u> at 118.) It was difficult for him to settle down to the quiet routine of the classroom and he sought help from his peers in completing his work. (<u>Id.</u>)

The next month, at the request of Ms. Spencer, a psychological educational assessment was completed for Plaintiff. (<u>Id.</u> at 125-53.) The team of evaluators included

a psychological examiner, a speech diagnostician, a social worker, a counselor, and a school nurse.  (<u>Id.</u> at 125.)  The team had before them a behavioral observation report completed based on classroom observations of Plaintiff from October 7 to November 18, 2002.  (<u>Id.</u> at 129-33.)  He had a moderate problem in the majority of facets of reading skills, reading comprehension, written expression, mathematics calculation, and mathematics reasoning.  (<u>Id.</u> at 129-30.)  He appeared "to have the most difficulty when directions [were] given."  (<u>Id.</u> at 130, 131.)  Instructions were most effective when given facing Plaintiff.  (<u>Id.</u>)  Only in the areas of being easily distracted, having a short attention span, and organizing and appropriately using time did Plaintiff not have a moderate problem in various aspects of work habits and classroom behaviors.  (<u>Id.</u> at 132.)  Plaintiff consistently had no problem in various aspects of intrapersonal behavior, e.g., acting impulsively or engaging in self-destructive or self-stimulating behavior.  (<u>Id.</u> at 133.)  In the area of interpersonal behavior, Plaintiff had a moderate problem only in blaming others and not accepting the consequences of his own actions and in being verbally aggressive to his peers and adults.  (<u>Id.</u>)

Also as part of the psychological assessment, Plaintiff was given several tests, including the Wechsler Intelligence Scale for Children, Third Edition ("WISC-III") and Vineland Adaptive Behavior Scale ("Vineland Scale").  (<u>Id.</u> at 144-45.) On the WISC-III, he achieved a verbal intelligence quotient (I.Q.) score of 97, a performance I.Q. score of 102, and a full scale I.Q. score of 98.  (<u>Id.</u> at 144.)  The conclusion was that, "although [Plaintiff's] achievement is below his grade level placement, he is achieving

commensurate with his cognitive ability." (Id. at 128.) His observed daily academic difficulties correlated to his deficits in psychological processing." (Id.) On the Vineland Scale, Plaintiff placed above his chronological age in the are of daily living skills and less than half his age in the area of socialization. (Id. at 144.) His level of maladaptive behavior was 29, which was "significant." (Id.) The speech and formal language evaluation employed an incorrect birthday for Plaintiff, assessing him as being one year younger than he was. (Id. at 135-39.)

The examiner noted that Plaintiff was tired and sleepy during the assessment and had to walk around to stay awake. (Id. at 135.) She opined that higher results could have been achieved had he been rested. (Id.) Although Plaintiff's overall language abilities were in the below average range, he was found to have an area of relative strength in recalling sentences. (Id. at 138.) On that portion of the evaluation titled "Social/Emotional/Behavioral," Plaintiff was referred to by his last name. (Id. at 143.) The name at the top of the page, however, is "Irvin, Phillip" with a birthday in March 1996. (Id.) Comments by his teacher that Plaintiff has severe deficits in his work habits and no indication of deficits in behavior are noted. (Id.) It was also noted that "[t]here is . . . no evidence in the file indicative of a significant behavioral problem that would seriously interfere with classroom performance and/or school functioning." (Id.) His teacher had administered the Devereux Behavior Rating Scale to Plaintiff on February 13; his scores placed him in the 73 percentile and normal level. (Id.)

The "Conclusions" portion of the evaluation again listed a 1996 birth year for Plaintiff. (Id. at 146.) The conclusion was that Plaintiff needed small group and individualized instruction to maximize his learning potential. (Id.)

On October 13, Plaintiff was suspended from riding the bus for two days because he refused to follow bus rules and was constantly hitting people. (Id. at 100.)

Fifteen weeks into the first grade, in December 2003, Plaintiff's teacher commented on a progress report that Plaintiff appeared to have the capacity to learn, but not the interest. (Id. at 117.) He was either sleeping or too busy playing to pay attention. (Id.) Ten weeks later, the teacher reported that he was not ready or mature enough for the second grade. (Id. at 118.) It was difficult for him to settle down to the quiet routine of the classroom and he sought help from his peers in completing his work. (Id.)

In February 2004, an IEP was developed for the next twelve months that placed him in special education instruction for 135 minutes per week and language therapy for 60 minutes per week. (Id. at 101-02.) It was noted that his "language weaknesses in semantics, syntax and morphology negatively impact his ability in the classroom setting." (Id. at 103.) Thus, he had difficulty in, among other things, comprehending and following directions and in expressing his ideas and needs. (Id.) These difficulties, in turn, might cause him to easily lose focus. (Id.) His vocal quality was adequate for his age and gender and his speech was fluent and intelligible. (Id.) His teacher estimated that he was working at the late kindergarten level in reading and math and at the kindergarten level in written language. (Id. at 104.) Goals were developed to help Plaintiff improve his use

of language skills.  (<u>Id.</u> at 109-11.)  A hearing screening indicated a need for a hearing evaluation.  (<u>Id.</u> at 104.)  He was not, however, described as hard of hearing.  (<u>Id.</u> at 107.)

To assist in the development of the IEP, Ms. Spencer completed a Family IEP Report.  (<u>Id.</u> at 114.)  He did not get along well with his peers or siblings.  (<u>Id.</u>)  As a goal for her son, she listed improvement in his behavior and "settl[ing] down."  (<u>Id.</u>)  The reward that worked best for him was money.  (<u>Id.</u>)

On February 11, Plaintiff was found standing on the ledge of the wall above the sinks in the boys' bathroom.  (<u>Id.</u> at 123.)  He jumped down when he saw the teacher.  (<u>Id.</u>)  On March 8, Plaintiff's teacher noted on a behavior record that Plaintiff had refused to do his morning work, banged on the desk with his pencil, talked constantly, refused to do what she asked, kicked another student, and called her a "b****".  (<u>Id.</u> at 119.)  Plaintiff was suspended for three days.  (<u>Id.</u> at 122.)  On March 19, four days after returning from his suspension, Plaintiff refused to do assigned work and, when told to stand against the wall, sat down and started eating his lunch.  (<u>Id.</u> at 120.)  When told to close his bag, he reached into it, took out a cracker, and put the cracker in his mouth.  (<u>Id.</u>)  He ran from the teacher and was escorted back to the wall.  (<u>Id.</u> at 120-21.)  He threw down his coat.  (<u>Id.</u>)  He then started picking up rocks and throwing them at other children.  (<u>Id.</u> at 121.)  After later returning from the principal's office, he "meow[ed]" for 15 minutes.  (<u>Id.</u>)  When going with the class to the gym, he yelled at the other children, meowed, sang, and talked the entire way.  (<u>Id.</u>)  Three days later, he danced and made noises when he should have been working.  (<u>Id.</u> at 119.)

On May 5, Plaintiff was suspended for two days. (Id. at 164A.) His behavior was described as being "out of control." (Id.) He had refused that day to stay at the wall for misbehaving, had left the principal's office without permission, and had gone to the lunchroom and thrown food. (Id.)

After Plaintiff was suspended in March 2004, he was evaluated by a mental health counselor, Delores H. Grady, M.S.W., L.C.S.W., at the Hopewell Center. (Id. at 183-96.) In that portion of the assessment form asking about reliability of information, Ms. Grady reported that Plaintiff lied about his behavior. (Id. at 186.) He reported he had no behavior problems at home and had such problems at school because of other children bothering him. (Id. at 187.) Ms. Spencer, described as a reliable informant, reported that Plaintiff had had two prior suspensions, including one time for "slamm[ing]" a child on concrete. (Id.) Plaintiff was not allowed to go on school field trips because of his behavior. (Id.) Plaintiff appeared for the assessment with a dirty shirt, which he used to blow his nose, and was disruptive during the assessment. (Id. at 190.) He said his mother lied. (Id.) Ms. Grady described Plaintiff's mood as obnoxious, angry and rebellious; his affect as sad, flat, and inappropriate; and his insight and judgment each as poor. (Id. at 191.) She assessed Plaintiff as having attention deficit hyperactivity disorder ("ADHD"), impulsive type; conduct disorder, childhood onset type; and borderline intellectual functioning. (Id. at 184, 192.) She assessed his current Global Assessment of

Functioning ("GAF")[5] score of 25.  (Id. at 184, 192.)  It was concluded, in part, that Ms. Spencer needed to be consistent with discipline and Plaintiff needed to be referred for a psychiatric evaluation.  (Id. at 195.)

A later progress note is illegible.[6]  (Id. at 203.)  A diagnosis was made and prescriptions were issued.  (Id.)  What either was is unclear.  (Id.)  The writing that can be deciphered reads "can't sit still[;] always into things."  (Id.)

Pursuant to the recommendation of the IEP team, a hearing evaluation of Plaintiff was performed in February 2004, and revealed a mild to moderate conductive loss in Plaintiff's right ear and a mid conductive loss in his left ear.  (Id. at 197-201.)  It also revealed an excessive build-up of cerumen, or ear wax, in his right ear canal.  (Id. at 197.)  It was recommended that Plaintiff be seen by his doctor for removal of the cerumen and be seated close to the teacher and away from noise sources until his hearing improved.  (Id.)  Special educational or psychometric testing should be deferred until that time also.  (Id.)

---

[5]"According to the Diagnostic and Statistical Manual of Mental Disorders 32 (4th Text Revision 2000), the Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning.'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n. 2 (8th Cir. 2003).  See also **Bridges v. Massanari**, 2001 WL 883218, *5 n.1 (E.D. La. July 30, 2001) ("The GAF orders the evaluating physician to consider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." (interim quotations omitted)).  "Lower GAF scores signify more serious symptoms." **Id.**  A GAF score between 21 and 30 is defined as: "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)." Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed. 1994) (alteration added).

[6]Ms. Grady's handwriting was very clear.

A non-examining consultant, Judith McGee, Ph.D.,[7] completed a Childhood Disability Evaluation Form[8] for Plaintiff in November 2002, and concluded that he had a severe impairment or combination thereof that did not meet or medically equal a listing-level impairment. (Id. at 173-77.) Assessing Plaintiff's ability to function in six domains, Dr. McGee concluded that Plaintiff had a less than marked limitation in the domains of acquiring and using information; attending and completing tasks; interacting and relating with others; moving about and manipulating objects; and caring for oneself. (Id. at 175, 177.) Plaintiff was found to have no limitation in the domain of health and physical well-being. (Id. at 177.) Dr. McGee noted that Plaintiff was not receiving special education services of any psychiatric treatment and that there was no diagnosis to support the allegation of behavior problem. (Id. at 176.)

## The ALJ's Decision

The ALJ first outlined the standard for finding a child disabled under the Act. (Id. at 13.) He then summarized Ms. Spencer's testimony and noted that the medical evidence established that Plaintiff had asthma, well controlled when his medication was taken as prescribed. (Id. at 14.) He next summarized Ms. Colli's[9] report, incorrectly describing it

---

[7]Isabel Mora, M.D., is listed as the consultant with overall responsibility.

[8]A "Childhood Disability Evaluation Form" is completed for children whose impairments are severe but are not a listed impairment. See 20 C.F.R. § 416.924(g).

[9]The ALJ mistakenly referred to Ms. Colli as Mr. Collins.

as covering the period from September 2001 to October 2002,[10] and the IEP assessment completed in February 2004. (Id.) He noted Plaintiff's disciplinary record. (Id. at 15.) He summarized Ms. Grady's March 2004 assessment of Plaintiff, incorrectly reporting her assessment of his GAF as 40.[11] (Id.) He accorded Ms. Colli's opinion and the IEP "great weight." (Id. at 16.) Noting that the opinions of non-examining consultants are not entitled to controlling weight, the ALJ further noted that he generally accepted those opinions as "supported and consistent with the objective evidence of record." (Id.) Ms. Grady's assessment of ADHD and conduct disorder were found to be supported by the record; her assessment of borderline intellectual functioning was not. (Id. at 16-17.) He gave no weight to her GAF assessment of Plaintiff as being unsupported by the objective evidence and inconsistent with school records. (Id. at 17.)

The ALJ next addressed Plaintiff's limitations in the six domains of functioning. (Id. at 17-20.) The six domains are: acquiring and using information; attending and completing tasks; interacting and relating with others; moving about and manipulating objects; caring for oneself; and health and physical well-being. (Id. at 18-20.) He concluded that Plaintiff had less than marked limitations in the first three areas. (Id. at 18-19.) In the second domain, attending and completing tasks, school records indicated Plaintiff had "some difficulty maintaining focus, distracting others, and following

---

[10]See note 3, above.

[11]Ms. Grady does list a 40 next to the line for an Axis IV diagnosis. (Id. at 183, 192.) She also notes "Father Incarcerated" on the line for Axis IV. The Axis V diagnosis is clearly 25 for Plaintiff's current GAF. (Id. at 183, 184.) She did not attempt to assess his highest GAF.

directions in the classroom." (Id. at 18.)  In the third domain, interacting and relating with others, Plaintiff was described as having "a history of minor disciplinary infractions at school, but is generally able to maintain age appropriate social functioning and get along with peers and adults.  IEP testing indicated no significant concerns with adaptive, emotional, or social behavior."  (Id.)  Moreover, his teacher had indicated that "[his] behavior could be modified and improved with guidance."  (Id. at 18-19.)

The ALJ next concluded that Plaintiff had no significant limitations in the domains of moving about and manipulating objects and no limitations in the domain of caring for oneself.  (Id. at 19.)  The latter conclusion was based, in part, on Plaintiff being "able to engage in age-appropriate personal hygiene and self-care tasks."  (Id.)  Plaintiff was also found to have no significant limitations in the domain of health and physical well being. (Id. at 19-20.)

Additionally, the ALJ found that Plaintiff's subjective complaints[12] were credible only to the extent they were supported by the evidence of record.  (Id. at 21.)

Plaintiff was, accordingly, not disabled within the meaning of the Act.

---

[12]Plaintiff did not testify at the administrative hearing.  Thus, it is not clear to what subjective complaints the ALJ is referring.

**Legal Standards**

Title 42 U.S.C. § 1382c(3)(C)(i) provides that "[a]n individual under the age of 18 shall be considered to be disabled for purposes of [SSI] if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." The Commissioner's decision denying a child SSI benefits is reviewed by this Court to determine whether it is supported by substantial evidence. **Rucker v. Apfel**, 141 F.3d 1256, 1259 (8th Cir. 1998); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998); **Frankl v. Shalala**, 47 F.3d 935, 937 (8th Cir. 1995). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." **Cox v. Apfel**, 160 F.3d 1203, 1206-07 (8th Cir. 1998). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the court must also take into account whatever in the record fairly detracts from that decision. **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998); **Bryant v. Apfel**, 141 F.3d 1249, 1250 (8th Cir. 1998). The court may not reverse that decision merely because substantial evidence would also support an opposite conclusion. **Tate v. Apfel**, 167 F.3d 1191, 1196 (8th Cir. 1999); **Pyland v. Apfel**, 149 F.3d 873, 876 (8th Cir. 1998). See also **Reed v. Sullivan**, 988 F.2d 812, 815 (8th Cir. 1993) ("[T]he possibility of drawing two

inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." (interim quotations omitted)).

Under the Act, the ALJ inquires into (1) whether the child was currently engaged in substantial gainful activity; (2) whether the child suffered severe impairments or a combination of severe impairments; and (3) whether the child's impairments met or equaled any listed impairments. **Bryant**, 141 F.3d at 1251. If, as in the instant case, the ALJ finds at step two of the evaluation that a child's impairments are severe, then the question at step three is whether those severe impairments cause "marked and severe functional limitations" and whether they meet the duration requirement of at least one year. 20 C.F.R. § 416.924(d). "An impairment(s) causes marked and severe functional limitations if it meets or medically equals the severity of a set of criteria for an impairment in the listings, or if it functionally equals the listings." Id. See also 20 C.F.R. § 416.924(a); 20 C.F.R. Part 404, Subpart P, Appendix 1, Part B.

"[I]n general, a child's impairment(s) is of 'listing level severity' if it causes marked limitations in two broad areas of functioning or extreme limitations in one such area." 20 C.F.R. § 416.925(b)(2). A limitation is "marked" for children from age 3 to age 18 if it is "'more than moderate' and 'less than extreme.'" 20 C.F.R. § 416.926a(e)(2). A "marked" limitation is also found when the impairment(s) "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities." Id. There may be a "marked" limitation in only one activity or in several activities as a result of the interactive and cumulative effects of the child's impairment(s). Id. A limitation is "extreme" for the

same age group if the impairment(s) "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3). "'Extreme' limitation also means a limitation that is 'more than marked.'" Id.

As noted by the ALJ, there are six broad areas of development or functioning that are addressed when considering the impairments of a child of Plaintiff's age. For Plaintiff's age, the criteria for the first domain, acquiring and using information, is "[w]hen you are old enough to go to elementary and middle school, you should be able to learn to read, write, and do math, and discuss history and science." 20 C.F.R. § 416.926a(g)(2)(iv). In the second domain, attending and completing tasks, a child's ability to focus and maintain attention, and to begin, carry through, and finish his or her activities, including the pace at which those activities are performed and the ease with which they are changed, is considered. Id. § 416.926a(h). A child of Plaintiff's age "should be able to focus [his or her] attention in a variety of situations in order to follow directions, remember and organize [his or her] school material, and complete classroom and homework assignments." Id. § 416.926a(h)(2)(iv). The third domain is interacting and relating with others. Id. § 416.926a(i). In this domain, a child of Plaintiff's age should, when entering school, "be able to develop more lasting friendships with children" his age. Id. § 416.926a(i)(2)(iv). Such a child should also "begin to understand how to work in groups to create projects and solve problems . . . [and] have an increasing ability to understand another's point of view and to tolerate differences." Id. Indications of limited functioning in this domain are the lack of close friends and difficulties playing

sports with rules. Id. § 416.926a(i)(3)(ii) and (iv). The fourth domain is moving about and manipulating objects. Id.§ 416.926a(j). The fifth domain is caring for oneself. Id.§ 416.926a(k). Relevant considerations in this domain are "how well [a child] maintain[s] a healthy emotional and physical state, including how well [the child] get[s] [his] physical and emotional wants and needs met in appropriate ways[.]" Id. (alterations added). A child Plaintiff's age should, among other things, "begin to develop understanding of what is right and wrong, and what is acceptable and unacceptable behavior." Id. § 416.926a(k)(2)(iv). The sixth domain is health and physical well being. Id. § 416.926a(l).

## Discussion

Plaintiff argues that the ALJ's conclusions about his ability to function in the domains of acquiring and using information, attending and completing tasks, and interacting and relating to others are not supported by substantial evidence. The Commissioner disagrees. For the reasons set forth below, the Court agrees.

The ALJ gave significant weight to Ms. Colli's assessment that Plaintiff's behavior appeared capable of modification and to Dr. McGee's assessment of his ability to function in the six domains. Neither constitutes substantial evidence. Ms. Colli, contrary to the ALJ's finding, had taught Plaintiff for less than two months before completing the teacher questionnaire, a time she described as "short." Moreover, these two months were in the fall of 2002, before Plaintiff was suspended from the bus and from school for misconduct. Additionally, his teacher the next year had continual problems with Plaintiff hitting others

and being willfully, and aggressively, defiant.  Dr. McGee also did not have the benefit of this second teacher's observations and reports but had only Ms. Spencer's comments on the SSA forms and Ms. Colli's questionnaire.  The evidence of Plaintiff's behavior after the fall of 2002 is that he had no friends and had difficulties following rules.  He was observed throwing rocks at other children and was described as "out of control."  As noted by the ALJ, Plaintiff did play organized football, but had controlled his defiance of the coach's rules only after being told it was the coach's "way or the highway."

The ALJ discounted Ms. Grady's assessment of Plaintiff's functioning on the basis of her qualifications, correctly noting that a mental health counselor was not an acceptable medical source.  <u>See</u> 20 C.F.R. § 416.913(a).  Ms. Grady's observations of Plaintiff's behavior and appearance were relevant, see <u>id.</u> § 416.913(d), and were closer in time to Plaintiff's apparently disintegrating behavior than the observations of Ms. Colli, also not an acceptable medical source.

Additionally, the ALJ emphasized the lack of a psychiatric diagnosis and treatment of Plaintiff.  Ms. Grady referred Plaintiff for a psychiatric evaluation.  Notes from Hopewell Center that were clearly not by Ms. Grady and that refer to a diagnosis and medication are illegible.  It is the duty of the ALJ, however, to develop the record and this duty requires that the ALJ recontact medical sources and order consultative examinations if "the available evidence does not provide an adequate basis for determining the merits of the disability claim."  **Sultan v. Barnhart**, 368 F.3d 857, 863 (8th Cir. 2004).

Although discrediting testimony by Plaintiff that was not given, the ALJ did not discuss Ms. Spenser's testimony. Her testimony was consistent with her reports on the various forms that Plaintiff was disruptive, aggressive, and was not allowed to play with other children because of his poor behavior. Her testimony describes a child who clearly does not appreciate what is acceptable and unacceptable behavior.

## Conclusion

The ALJ's factual and other errors fatally distracted from the substantial evidence upon which he relied when denying Plaintiff's application for SSI. The Court finds that this case must be remanded to the Appeals Council for remand to the ALJ for further development of the record, an assessment of Ms. Spencer's credibility, and, if necessary, a consultative examination. Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is REVERSED and this case is REMANDED for further proceedings consistent with this Memorandum and Order.

An appropriate Judgment shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 7th day of March, 2006.